IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 9, 2024

**STATE OF TENNESSEE v. FORREST RAY HESTER**

**Appeal from the Circuit Court for Bedford County**
No. 18433     Forest A. Durard, Jr., Judge
_____

**No. M2023-01312-CCA-R3-CD**
_____

A Bedford County jury convicted the Defendant, Forrest Ray Hester, of delivery of .5 grams or more of methamphetamine based upon a theory of criminal responsibility, possession of .5 grams or more of methamphetamine with the intent to sell, and possession of .5 grams or more of methamphetamine with the intent to deliver.  Following a sentencing hearing, the trial court merged the possession convictions and imposed an effective sentence of sixteen years to be served in confinement.  On appeal, the Defendant asserts that the evidence is insufficient to support his convictions and that his co-defendant's guilty plea to sale/delivery of methamphetamine based on a theory of criminal responsibility precludes the Defendant's conviction for the same offense based on a theory of criminal responsibility.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J. and JOHN W. CAMPBELL, SR., J., joined.

Jonathon Fagan, Auburntown, Tennessee, for the appellant, Forrest Ray Hester.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael D. Randles and Lisa Zavogiannis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Procedural History**

On June 2, 2016, the Seventeenth Judicial District Drug Task Force ("Drug Task Force") used a confidential informant to conduct a controlled purchase of methamphetamine at a house in Bedford County, Tennessee.  During the surveillance of the house, an officer observed the Defendant and Rebecca Perry arrive in a car driven by

the Defendant, enter the house, and then leave shortly after the controlled buy was completed. During a traffic stop that occurred shortly thereafter, officers found on Ms. Perry's person the cash that Drug Task Force officers had given the CI to purchase drugs, numerous empty baggies in Ms. Perry's purse, and four baggies of methamphetamine in cigarette packages underneath the driver's seat where the Defendant had been sitting.

For these offenses, a grandy jury indicted the Defendant with criminal responsibility for the sale and delivery of .5 grams or more of methamphetamine, a Schedule II controlled substance, possession of .5 grams or more of methamphetamine with the intent to sell, possession of .5 grams or more of methamphetamine with the intent to deliver, and possession of drug paraphernalia. The Defendant was not apprehended for several years following his indictment. His trial commenced on September 29, 2022.

Lieutenant Timothy Miller with the Lewisburg Police Department testified that in June 2016, when he was a member of the Drug Task Force, he met with Shawn Watkins, a confidential informant who had provided reliable information in the past that led to the arrests and convictions of multiple people. Lieutenant Miller testified that the Drug Task Force officers intended to use Mr. Watkins to conduct a controlled purchase of methamphetamine from Brandy Lewis. In preparation for the controlled buy, officers searched Mr. Watkins's person and vehicle and provided him with an audio recording device and $240 in twenty-dollar bills in which to purchase the drugs. Lieutenant Miller made a photocopy of the cash prior to giving it to Mr. Watkins.

Lieutenant Miller testified that he and other officers followed Mr. Watkins as he drove to an apartment complex in Shelbyville, and officers observed June Fisher enter Mr. Watkins's vehicle. The officers then followed Mr. Watkins's vehicle to Kevin Jones's home in Wartrace. Lieutenant Miller stated that the home of Mr. Jones, who was deceased by the time of trial, was used by dealers as a place to conduct drug transactions. Lieutenant Miller observed Mr. Watkins pull his vehicle "pretty close" to Mr. Jones's house and Ms. Fisher exit the vehicle and walk toward the front of the house. Mr. Watkins then parked at the top of a hill that was beside Mr. Jones's house but was out of the view of those who were at the house. Because other officers had a "direct eye" on Mr. Jones's home, Lieutenant Miller maintained surveillance on Mr. Watkins. Once other officers alerted Lieutenant Miller that Ms. Fisher exited the house and returned to Mr. Watkins's vehicle, Lieutenant Miller followed Mr. Watkins back to the apartment complex where Ms. Fisher lived. Once Ms. Fisher exited Mr. Watkins's vehicle, Lieutenant Miller followed Mr. Watkins to the location where they planned to meet following the controlled buy.

Lieutenant Miller stated that Mr. Watkins gave him two small plastic baggies containing what appeared to be crystal methamphetamine. Officers sealed the baggies and sent them to the Tennessee Bureau of Investigation ("TBI") for testing. Lieutenant Miller

asked Mr. Watkins about the transaction, and Mr. Watkins "relayed pretty much what [Lieutenant Miller] testified to what happened." Lieutenant Miller searched Mr. Watkins and his vehicle to ensure that Mr. Watkins did not have any drugs or the cash that officers had given him in his possession, and Lieutenant Miller did not find anything.

Lieutenant Miller testified that officers stopped a car that was driven by the Defendant and occupied by Ms. Perry after the car left Mr. Jones's house following the drug transaction. Officers found approximately $300 in cash during the traffic stop, and the serial numbers of the twenty-dollar bills totaling $240 matched the serial numbers of the twenty-dollar bills that the officers had given to Mr. Watkins for the controlled buy.

On cross-examination, Lieutenant Miller testified that at the time of the controlled buy, Mr. Watkins was under investigation for "low level crack cocaine distribution" and that because of Mr. Watkins's assistance to the police, he received "some help" on his pending criminal charges. Lieutenant Miller stated that the original target, Brandy Lewis, was not present at the location of the controlled buy. The controlled buy occurred on the afternoon of June 2, 2016, and upon arriving at Mr. Jones's home, Lieutenant Miller parked approximately fifty to one hundred yards behind Mr. Watkins's vehicle. Lieutenant Miller could not see who entered the house from where he was parked but obtained information from other officers who had a view of the house. Lieutenant Miller did not recall whether he or other officers were listening to the events from the audio recorder on Mr. Watkins's person as they occurred.

Shawn Watkins, the confidential informant, testified that he participated in controlled drug buys with the Drug Task Force and provided them with information on illegal drug activities. Mr. Watkins testified that on June 2, 2016, he met with Lieutenant Miller and other officers with the Drug Task Force to prepare for a controlled drug buy through Ms. Fisher. The officers searched Mr. Watkins's person and vehicle and did not find anything. They also installed a tracker on his vehicle and provided him with an audio recording device to use during the controlled buy. The officers provided Mr. Watkins with money to purchase "a couple of grams" of methamphetamine.

Mr. Watkins testified that he drove to Ms. Fisher's apartment where he was to purchased drugs from a woman. However, when he arrived, the woman was not there, and Ms. Fisher told him that she knew of another location where he could purchase drugs. Mr. Watkins told Ms. Fisher that he planned to mix the methamphetamine with cocaine and then resell it. He explained that he did not believe he would be able to purchase the amount of methamphetamine that he was seeking to purchase had he stated that the drugs were for his own personal use.

Mr. Watkins testified that he drove Ms. Fisher to Mr. Jones's house and that he was aware that officers from the Drug Task Force followed him. Mr. Watkins explained that Mr. Jones was a cousin and that if Mr. Watkins entered the house, "it would have bl[own] [his] cover." He told Ms. Fisher that he did not want to enter the house because he did not want his cousin to know his business. Mr. Watkins parked on a hill that was next to the house and was hidden by bushes out of the view of anyone at the house. He counted out the money and gave it to Ms. Fisher, and he instructed her to not give the money to anyone other than the person who was bringing the drugs. Ms. Fisher exited his car and walked toward the house, but Mr. Watkins could not see if Ms. Fisher entered the house from where he was parked.

Mr. Watkins testified that it seemed as if he was waiting "forever" for Ms. Fisher to return. At one point, he called Ms. Fisher and asked her about the delay, and she replied that she was waiting for the person with the drugs to arrive. Mr. Watkins saw a man and a woman in a car enter Mr. Jones's driveway. Mr. Watkins stated that he could not describe the car or the driver because he was focused on a motorcycle that drove by the area multiple times, and he mentioned the motorcycle to the officers through the audio recording device that he was wearing. Mr. Watkins was unable to see the car after it entered the driveway and anyone from the car who entered the house because bushes blocked Mr. Watkins's line of sight to the house. Sometime after the car entered the driveway, Ms. Fisher returned and gave Mr. Watkins two baggies containing what appeared to be methamphetamine. Ms. Fisher asked for some of the drugs in compensation for her role as the "go-between person." Although the officers instructed Mr. Watkins against doing so, he gave Ms. Fisher a "pinch" of the drugs, explaining that he believed that she would not have "worked" with him again had he not done so. Ms. Fisher asked for more drugs, but Mr. Watkins refused.

After dropping Ms. Fisher off at her apartment, Mr. Watkins met with the officers, gave them the drugs and the audio recorder, and informed them of his giving Ms. Fisher a "pinch" of the drugs. Mr. Watkins denied taking any of the drugs for his own personal use. The officers searched his person and his vehicle and did not find any drugs or money.

The State played the audio recording from the recorder provided to Mr. Watkins for the jury. Mr. Watkins noted that at approximately five minutes into the recording, he spoke to Ms. Fisher on his cell phone and that she entered his car at approximately ten minutes and forty-two seconds into the recording. Mr. Watkins identified the portion of the recording when he called Ms. Fisher while parked beside Mr. Jones's house and asked her why it was taking so long. At approximately fifty-five minutes into the recording, Mr. Watkins stated that he saw a car pull into the driveway. Shortly thereafter, Ms. Fisher called him and asked whether he was in the car that had pulled into the driveway, and Mr. Watkins stated that he was not in that car. By one hour and eleven minutes into the recording, Ms. Fisher had returned to Mr. Watkins's car, and he told her that he planned to

mix the methamphetamine with cocaine, sell the drugs, and then return to purchase additional drugs. Approximately five minutes later, Ms. Fisher requested some of the drugs and expressed her dissatisfaction with the small amount of drugs that Mr. Watkins gave her.

June Fisher testified that in 2016, she was addicted to crack cocaine and that Mr. Watkins was her drug dealer. She denied using methamphetamine. She stated that on June 2, 2016, Mr. Watkins came to her apartment in Shelbyville and drove her to Mr. Jones's home in Wartrace to purchase methamphetamine. Mr. Watkins stated that he did not want to go inside the house because Mr. Jones was a relative, and Mr. Watkins gave her money to purchase methamphetamine. Ms. Fisher entered the house and waited for some time before the seller arrived. She stated that she saw a white car pull into the driveway and that a woman whose name she did not know entered the house. Ms. Fisher denied that anyone else was with the woman. Ms. Fisher stated that she gave the woman the entire amount of the money and that the woman gave her the drugs. Ms. Fisher then returned to Mr. Watkins's car and gave him the drugs. She stated that she asked Mr. Watkins for some of the drugs because she planned on selling the drugs for cash but that Mr. Watkins gave her only a small amount.

Ms. Fisher testified that she later was arrested and charged with selling methamphetamine. She pleaded guilty to the charge, received a nine-year sentence, and served three years in confinement before she was paroled. She denied receiving any consideration from the State in exchange for her testimony at trial.

Agent Steven Daugherty, who was assigned to the Drug Task Force in 2016, testified that on June 2, 2016, he participated in the surveillance of Mr. Jones's house. Agent Daugherty positioned himself across the street from Mr. Jones's house where he could see the driveway and front and side doors. Agent Daughtery saw Mr. Watkins's car "for a brief minute" as it backed into an area out of Agent Daughtery's view. A short time later, he saw Ms. Fisher walk from the location where Mr. Watkins's car had gone to Mr. Jones's house and enter through the side door of the house.

Agent Daughtery testified that he maintained constant contact with other officers and that he received information that someone who had drugs would possibly be arriving at the house. A short time after he received the information, Agent Daughtery saw a gold Mercury Marquis pull into the driveway. The Defendant exited the car on the driver's side; Ms. Perry exited on the passenger's side; and they both entered the house through the side door. Agent Daughtery stated that he was familiar with the layout of Mr. Jones's house after having responded to calls to the house on prior occasions. He noted that the side door led into the kitchen, that the front door led into the living room, and that there was a doorway between the living room and the kitchen so that those in the living room may not

necessarily have seen those who were in the kitchen. He stated that as a result, it was "very plausible" that Ms. Fisher did not see the Defendant inside the house.

Agent Daughtery testified that less than five minutes after the Defendant and Ms. Perry entered the house, he saw Ms. Fisher exit the house through the side door and walk toward the area where Mr. Watkins had parked. Agent Daughtery then saw Mr. Watkins's car leave the area and proceed toward Shelbyville. Agent Daughtery remained on the scene and saw the Defendant and Ms. Perry exit the house through the side door. The Defendant entered the car on the driver's side, and Ms. Perry entered on the passenger's side. The Defendant drove away, and Agent Daughtery followed the car.

Agent Daughtery testified that he contacted Patrolman Danny Odemal to assist in the surveillance of the car and possibly to conduct a traffic stop. Agent Daughtery explained that he did not want to conduct a traffic stop himself because he was in an unmarked vehicle with no emergency equipment and that if he effectuated the stop as a member of the Drug Task Force, the occupants would determine that they had been involved in a controlled drug buy, which could place Mr. Watkins in harm's way or ruin his cover. The Defendant and Ms. Perry stopped at a store, and while they were inside the store, Agent Daughtery joined Patrolman Odemal inside his vehicle. Once the Defendant and Ms. Perry exited the store, the Defendant entered the car on the driver's side, and Ms. Perry entered on the passenger's side. As the Defendant was driving out of the parking lot, Agent Daughtery observed that the Defendant was not wearing a seatbelt. Patrolman Odemal activated the lights on his vehicle and conducted a traffic stop of the Defendant's vehicle.

Agent Daughtery testified that while he remained inside the patrol car, Patrolman Odemal approached the Defendant's car on the driver's side and spoke to the Defendant. Patrolman Odemal returned to his patrol car and told Agent Daughtery that the Defendant admitted that he did not have a driver's license, which was "an arrestable infraction." Agent Daughtery exited the patrol car and asked the Defendant whether any narcotics were in the car, and the Defendant stated that a marijuana "blunt" was in the cupholder.

Agent Daughtery testified that he searched Ms. Perry's purse where he found empty plastic baggies like those used to package drugs. He stated that as a result, he believed he would find additional evidence inside the car. He also recovered $334 in cash from Ms. Perry's person. Agent Daughtery and Lieutenant Miller later were able to match the serial numbers on $240 of the cash recovered from Ms. Perry to the serial numbers on the cash given to Mr. Watkins for the controlled drug buy.

Agent Daughtery stated that he separated Ms. Perry from the Defendant and advised her of her rights and that Ms. Perry waived her rights and agreed to continue speaking to

him. She acknowledged that drugs were inside the car. The officers searched the car and found two cigarette packages underneath the driver's seat. Inside one cigarette package were three baggies containing what Agent Daughtery believed to be crystal methamphetamine. Inside the second cigarette package were cigarettes and one baggie containing what appeared to be crystal methamphetamine. Agent Daughtery stated that the area in which the cigarettes were found would have been easily accessible to the Defendant while he was sitting in the driver's seat. The four baggies were subsequently sealed and sent to the TBI for testing.

Agent Daughtery testified that after he advised the Defendant of his rights and of the drugs that were found in the car, the Defendant did not deny that the drugs belonged to him and acknowledged that he and Ms. Perry were involved in the distribution of crystal methamphetamine. Agent Daughtery said the Defendant allowed him to review text messages on his cell phone. Agent Daughtery stated that approximately two hours and fifteen minutes prior to the stop and shortly before the controlled drug buy at Mr. Jones's house occurred, the Defendant received a text message stating, "I need 2 G's, are you good?" Agent Daughtery explained that "2 G's" means two grams, the same quantity of drugs involved in the controlled drug buy. Agent Daughtery testified that the quantity of drugs found in the car and the way in which they were packaged led him to believe that the drugs were for distribution rather than for personal use. Agent Daughtery did not locate any instruments typically used to take the drugs inside the car.

Although the Defendant and Ms. Perry initially agreed to cooperate with the police, Agent Daughtery testified that he lost contact with them after forty-eight hours. The Defendant was arrested years later in Smyrna, Tennessee. In 2020, Ms. Perry was arrested in Detroit, Michigan, and was transferred back to Tennessee for prosecution. Agent Daughtery believed Ms. Perry was in prison at the time of the Defendant's trial.

On cross-examination, Agent Daughtery testified that the Drug Task Force did not have body cameras or dash cameras at the time of the traffic stop. He stated that in 2020, "word" of the indictment was relayed to the Defendant through his attorney. Ms. Perry also was charged for various drug-related offenses and pleaded guilty to the sale and delivery of methamphetamine based on a theory of criminal responsibility.

Special Agent Brett Trotter, a forensic scientist with the TBI's forensic chemistry unit, examined the two baggies of crystalline substances obtained by the Drug Task Force during the controlled drug buy at Mr. Jones's house. The net weight of the substance in one of the baggies was .77 grams, and Special Agent Trotter determined that the substance contained methamphetamine, a Schedule II controlled substance. The second baggie that contained a white crystalline substance had a gross weight of .81 grams.

TBI Special Agent Laura Cole examined the four baggies of crystalline substance obtained during the traffic stop. She weighed the substance contained in two of the baggies, and she stated that the net weight of the substance in one baggie was .78 grams and that the net weight of the substance in a second baggie was .72 grams. She stated that the substances in both baggies tested positive for methamphetamine. She weighed the other two baggies along with the substances in those baggies and determined that the gross weight of one of the baggies was 1.09 grams and that the gross weight of the other baggie was .47 grams.

Following the conclusion of the proof, the jury convicted the Defendant of delivery of .5 grams or more of methamphetamine based upon a theory of criminal responsibility, possession of .5 grams or more of methamphetamine with the intent to sell, and possession of .5 grams or more of methamphetamine with the intent to deliver. The jury acquitted the Defendant of possession of drug paraphernalia. Following a sentencing hearing, the trial court merged the possession convictions and imposed consecutive eight-year sentences for the delivery and the possession convictions, for an effective sentence of sixteen years to be served in confinement. The Defendant filed a motion for new trial, which the trial court denied. The Defendant then filed a timely notice of appeal.

## II. Analysis

On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions, asserting that "the evidence proffered by the State was contradicted by the [S]tate's own witnesses, was uncorroborated by any of the State's witnesses, or was simply non-existent when it could have easily been obtained by the State." The Defendant also asserts that his co-defendant's guilty plea to sale/delivery of methamphetamine based on a theory of criminal responsibility precludes the Defendant's conviction for the same offense based on a theory of criminal responsibility. The State responds that the Defendant waived his claims on appeal due to inadequate briefing and that the Defendant otherwise failed to establish that he is entitled to relief.

As noted by the State, the Defendant's brief falls short of the requirements set forth in the Tennessee Rules of Appellate Procedure and the rules of this court. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires the appellant to set forth the contentions "with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]" Rule 10(b) of the rules of this court provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."

The Defendant's argument in his brief that his conviction for delivery of a controlled substance under a theory of criminal responsibility cannot be sustained when his co-defendant pleaded guilty to the same offense under a theory of criminal responsibility consists of one-half of one page in which he cites to no authority to support his claim. Although the State argued in its brief that the Defendant's brief was deficient, the Defendant did not seek to cure the deficiencies in his reply brief. Rather, in his reply brief, he attacked the State and its decision to argue waiver and asserted that "[t]his commonplace argument by the State has become so boilerplate and baseless in each and every of its briefs before this Honorable Court that the State should be sanctioned for its continued conduct in this regard."

Contrary to the Defendant's argument, however, this court has concluded on numerous occasions that the State's argument of waiver due to an appellant's inadequate briefing was correct. *See, e.g., State v. Cunningham*, No. M2023-00909-CCA-R3-CD, 2024 WL 3634259, at \*2-3 (Tenn. Crim. App. Aug. 2, 2024), *no perm. app. filed*; *State v. Moss*, No. M2021-00043-CCA-R3-CD, 2023 WL 1117795, at \*1-2 (Tenn. Crim. App. Jan. 31, 2023), *no perm. app. filed*; *State v. Molthan*, No. M2021-01108-CCA-R3-CD, 2022 WL 17245128, at \*2 (Tenn. Crim. App. Nov. 28, 2022), *no perm. app. filed*; *State v. Burgins*, No. E2021-00620-CCA-R3-CD, 2022 WL 2317028, at \*25 (Tenn. Crim. App. June 28, 2022), *perm. app. denied* (Tenn. Nov. 16, 2022). The Defendant likewise failed to cite to any authority to support his claim that his conviction for delivery of a controlled substance based on a theory of criminal responsibility cannot be sustained in light of the co-defendant's guilty plea. "Failure to cite authority to support argument will result in waiver of the issue." *State v. Watson*, 227 S.W.3d 622, 648 (Tenn. Crim. App. 2006) (citing Tenn. Ct. R. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997)); *see* Tenn. R. App. P. 27(a)(7)(A). Accordingly, the Defendant has waived this issue.

Regarding the sufficiency of the evidence, the Defendant does not cite to the statutes upon which his convictions were based or otherwise identify any elements of his convictions that he believes are not supported by sufficient evidence. In his argument, the Defendant cites only two cases, one case regarding the standard of appellate review and one case in challenging the credibility of the Drug Task Force officers. Notwithstanding the deficiencies in the Defendant's brief, we conclude that the evidence is sufficient to support the Defendant's convictions.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d

247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally

insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

It is a criminal offense for a defendant to knowingly deliver methamphetamine or possess methamphetamine with the intent to deliver or sell methamphetamine. T.C.A. § 39-17-434(a)(2), (4). The offense is a Class B felony "if the amount involved is point five (0.5) grams or more of any substance containing . . . methamphetamine." T.C.A. § 39-17-417(c)(1); *see* T.C.A. § 39-17-434(e)(1) ("A violation of [Code section 39-17-434(a)] shall be punished as provided in § 39-17-417."). The term "delivery" is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." T.C.A. § 39-17-402(6). As the trial court instructed the jury, a person is criminally responsible for an offense committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

The evidence when viewed in the light most favorable to the State established that the Drug Task Force set up a controlled drug buy using Mr. Watkins, a confidential informant. Officers searched Mr. Watkins and his vehicle prior to the controlled drug buy and gave Mr. Watkins an audio recording device and $240 in twenty-dollar bills to purchase methamphetamine. Mr. Watkins and Ms. Fisher went to Mr. Jones's house where Ms. Fisher entered to await the delivery of the methamphetamine. While conducting surveillance of Mr. Jones's house, Agent Daughtery observed the Defendant and Ms. Perry arrive in a gold car and enter the house. Although Ms. Fisher testified that she did not see a man enter the house, she stated that she gave the woman who entered the house the cash and that the woman gave her the drugs. Ms. Fisher then left Mr. Jones's house, returned to Mr. Watkins's car, and gave him the drugs. After Mr. Watkins drove Ms. Fisher back to her apartment, he met with officers and gave them two baggies of a crystalline substance that appeared to officers to be methamphetamine. Testing by the TBI confirmed that the crystalline substance contained methamphetamine and weighed more than .5 grams.

Meanwhile, Agent Daughtery followed the Defendant and Ms. Perry as they left Mr. Jones's house, and Agent Daughtery and another officer conducted a traffic stop of the vehicle shortly thereafter. Agent Daughtery found baggies typically used to package drugs in Ms. Perry's purse, the $240 in cash given to Mr. Watkins by the Drug Task Force officers to purchase methamphetamine on Ms. Perry's person, and multiple baggies containing a crystalline substance that appeared to be methamphetamine underneath the driver's seat where the Defendant had been sitting. Testing by the TBI confirmed that the crystalline substance contained methamphetamine and weighed more than .5 grams. The Defendant admitted to Agent Daughtery that he and Ms. Perry were involved in the distribution of crystal methamphetamine. Agent Daughtery testified that the amount of the drugs and the

way in which they were packaged indicated that the drugs were for resale rather than for personal use. He also testified regarding text messages on the Defendant's cell phone that were indicative of someone requesting to purchase drugs from the Defendant.

On appeal, the Defendant does not identify any elements of his convictions that he believes are not supported by sufficient evidence. Rather, he asserts that the witnesses gave conflicting testimony, and he challenges the credibility of the witnesses and the weight to be given to their testimony. In examining the sufficiency of the evidence, we may not reweigh or reevaluate the evidence, and we may not substitute our inferences for those drawn from the evidence by the jury as the trier of fact. *See Reid*, 91 S.W.3d at 277; *Bland*, 958 S.W.2d at 659. Rather, the jury's verdict resolved any such conflicts in the favor of the State. *See Reid*, 91 S.W.3d at 277; *Bland*, 958 S.W.2d at 659. The Defendant also relies on a credibility finding against the Drug Task Force made by a federal judge in an unrelated case to challenge the credibility of the testifying officers and as evidence that the officers had the technology available to record the traffic stop but chose not to do so. *See United States v. Ruiz*, 832 F.Supp.2d 903 (M.D. Tenn. 2011). However, the Defendant waived this issue by failing to present this evidence in the trial court. *See* Tenn. R. App. P. 3(e), 36(a).

We conclude that when viewed in a light most favorable to the State, the evidence is sufficient to support the Defendant's convictions. Accordingly, he is not entitled to relief regarding this issue.

### III. Conclusion

Based on our review of the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE